IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TERRI S. ANDERSON            )
                             )
v.                           )    No. 3:07-0343
                             )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


**REPORT AND RECOMMENDATION**

          This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff's application
for disability insurance benefits ("DIB"), as provided under
Title II of the Social Security Act ("the Act"), as amended.  The
case is currently pending on plaintiff's motion for judgment on
the administrative record (Docket Entry No. 14), to which
defendant has responded (Docket Entry No. 20).  Plaintiff has
further filed a reply to defendant's response (Docket Entry No.
21).  Upon consideration of these papers and the transcript of
the administrative record (Docket Entry No. 12), and for the
reasons given below, the undersigned recommends that plaintiff's
motion be **GRANTED**, and that the decision of the Commissioner of
Social Security be **REVERSED** and the cause **REMANDED** for an
immediate award of benefits consistent with the onset of
disability as of March 29, 2001.

1

# I. Procedural History

Plaintiff filed her DIB application on October 25, 2000 (Tr. 58-60), alleging the onset of disability as of April 1999. This application was denied at the state agency level of administrative review, and again upon review by an Administrative Law Judge ("ALJ"). (Tr. 28-36, 46-49, 51-52) After the Social Security Administration's ("SSA") Appeals Council declined to review the ALJ's decision, that decision became final and appealable to this Court. Plaintiff sought such judicial review on April 19, 2004, which the SSA elected not to defend, resulting in the reversal and remand of the first ALJ's decision (Tr. 434-39). After receiving the order of remand, the Appeals Council directed that the matter be remanded for further development and decision at the ALJ level, and instructed the ALJ to secure the services of a medical expert to testify at plaintiff's rehearing (Tr. 398-99).

On May 4, 2005, a second hearing was held before a new ALJ (Tr. 736-98). Plaintiff appeared with counsel, and testimony was received from plaintiff, a vocational expert, and a medical expert. The ALJ took the case under advisement until August 23, 2005, when she issued a decision that again denied plaintiff's claim of disability (Tr. 380-88). That decision, which essentially discounts the subjective claim of disability as objectively unverified, contains the following enumerated

2

findings:

1.  The claimant met the insured status requirements of the
    Act as of the alleged onset date.

2.  The claimant has not engaged in substantial gainful
    activity since the alleged onset date.

3.  The claimant has "severe" impairments including
    fibromyalgia, Meniere's disease, and depression.

4.  The claimant's impairments, considered individually and
    in combination, do not meet or equal in severity any
    impairment set forth at 20 C.F.R. Part 404, Subpart P,
    and Appendix 1.

5.  The claimant's allegations of pain and functional
    limitations are not fully credible for the reasons
    discussed above.

6.  The claimant retains the residual functional capacity
    to perform a limited range of light work as described
    above.

7.  The claimant can perform past relevant work, per VE
    testimony.

8.  The claimant is not disabled within the meaning of the
    Act.

(Tr. 387-88)

        On February 6, 2007, the Appeals Council denied

plaintiff's request for review of the ALJ's decision (Tr. 374-

76), thereby rendering that decision the final decision of the

Commissioner of Social Security.  This civil action was

thereafter timely filed, and the court has jurisdiction.  42

U.S.C. § 405(g).  If the Commissioner's findings are supported by

substantial evidence, based on the record as a whole, then these

findings are conclusive.  Id.

Case 3:07-cv-00343   Document 22   Filed 09/10/08   Page 3 of 45 PageID #: 107

## II.  Review of the Record

The following record review is taken in large measure from plaintiff's memorandum (Docket Entry No. 15 at 2-16).

### A.  Personal Information

Plaintiff alleged disability commencing April 20, 1999 (Tr. 58, 67, 327) due to fibromyalgia and chronic fatigue syndrome (Tr. 68).  She was insured for DIB through December 31, 2004 (Tr. 61-62, 443).  Plaintiff was born on October 18, 1956 (Tr. 58, 326) and is a high school graduate (Tr. 73, 327).

### B.  Plaintiff's Work History

For several years prior to April 1999, plaintiff worked for Budget Insurance Centers, starting out as an agent, selling property and casualty insurance, and ending up as office manager (Tr. 68, 88, 327-328).  Before that, she worked about a year as office/finance manager at Champion Marine (Tr. 68, 87, 329).  Before that, she worked about a year as an insurance clerk/agent (Tr. 68, 86).  Before that, plaintiff worked seasonally as a receptionist at an H & R Block tax office (Tr. 68, 83, 330).

### C.  Medical Evidence: Fibromyalgia

On April 28, 1998, plaintiff's primary care physician, Herbon Fleming, M.D., referred plaintiff to James Morgan, M.D. (Tr. 146, 212) for evaluation of headaches and myalgias (Tr. 212).  Dr. Morgan, a neurologist, examined plaintiff on June 29, 1998 (Tr. 212-214).  He noted plaintiff was on a leave of absence

4

from her job at the time (Tr. 212).  Plaintiff reported a
constellation of symptoms to Dr. Morgan including headaches,
insomnia, dizziness, tinnitus, muscle cramping, right elbow pain,
fatigue, chest tightness, and shortness of breath (Tr. 212).  Dr.
Morgan's examination revealed diffuse palpable paraspinal and
paracervical tenderness bilaterally (Tr. 213).  Plaintiff
reported decreased sensation in her right upper and lower
extremities, when compared to the left, and Dr. Morgan ordered an
EMG (Tr. 213), which revealed mild right peroneal neuropathy (Tr.
215).

     Dr. Fleming reported on August 25, 1998, that plaintiff
complained of sporadic, random muscle spasm all over her body, as
well as fatigue and insomnia (Tr. 144).  At that time, he noted
no positive trigger points and diagnosed her with nonspecific
pain and anxiety.  Id.  By the time of her next visit, on
September 16, 1998, she was noted to have multiple trigger points
(Tr. 143), and Dr. Fleming referred plaintiff to the Vanderbilt
Rheumatology Clinic for evaluation of fibromyalgia.  On October
8, 1998, she saw  James W. Thomas, M.D., a professor at
Vanderbilt Medical School (Tr. 221, 255).  Dr. Thomas noted
plaintiff's five-year history of insomnia and her complaints of
diffuse body pain, particularly in her back and neck, as well as
multiple trigger points and palpable muscle spasms in her neck,
trapezoid, and paraspinous muscles.  Id. Dr. Thomas opined

5

plaintiff's symptoms were compatible "with the syndrome of soft tissue rheumatism that is called fibromyalgia." Id. He noted that "t]he fact that the laboratory studies which you kindly included are entirely normal is consistent with this diagnosis." Id. Dr. Thomas recommended plaintiff undergo physical therapy in an effort to help improve her muscle tone and decrease her pain and take a sleep aid in an effort to establish a normal sleep pattern. Id. Beyond that, Dr. Thomas had little to offer. Id. Plaintiff started physical therapy shortly thereafter (Tr. 222) and has undergone physical therapy on other occasions (Tr. 220, 226-231).

Dr. Fleming referred plaintiff to other specialists to rule out other causes for plaintiff's symptoms: Stephan Sharp, M.D. (thyroid disease) (Tr. 209-211), Keehn Hosier, M.D. (gynecological consultation) (Tr. 205-06), and Ronald Zellem, M.D. (neurosurgical consultation) (Tr. 223-225). None of these specialists found any significant abnormality within their field of expertise.

Plaintiff again saw Dr. Thomas, the Vanderbilt rheumatologist, on January 27, 2000 (Tr. 253-254). Dr. Thomas noted that since her last visit, plaintiff reported some improvement in her level of fatigue, but her level of pain was unchanged. Id. Her examination was essentially unchanged from her October 1998 visit, and she was again noted to exhibit

6

tenderness in her trapezoid and paraspinous muscles, even to light palpation. Id. Dr. Thomas recommended some changes in her treatment regimen and opined that, "at this point in time, I believe Ms. Anderson is doing reasonably well and that she is truly making an effort to cope with her chronic pain syndrome." Id.

In a narrative typewritten report "To Whom It May Concern" dated May 28, 2002, Dr. Fleming reported that "[d]ue to the severity of [plaintiff's] condition she is no longer able to work, she's unable to do basic household chores at times, and is unable to drive herself to doctor['] s appointments." (Tr. 299). Dr. Fleming, who treated plaintiff since August 1994 (Tr. 158, 299), also executed a detailed residual functional capacity questionnaire reflecting his opinion as to her disability (Tr. 294-298).

D. Medical Evidence: Meniere's Disease

Plaintiff consulted Scott Fortune, M.D., an ear, nose, and throat specialist, on March 29, 2001 (Tr. 290). She reported a five-month history of bilateral tinnitus, left-sided hearing loss, bilateral aural fullness, left ear pain, disequilibrium, spinning vertigo, and congestion of the ears. Id. She complained of stumbling often and veering when she walked, as well as difficulty judging distances. Id. Dr. Fortune ordered audiological testing, which revealed severe asymmetric

7

sensorineural hearing loss and a significant discrepancy in speech discrimination scores (Tr. 290-91). Dr. Fortune ordered a ENG on April 9, 2001, which was also interpreted as abnormal (Tr. 284). On April 11, 2001, Dr. Fortune met with plaintiff to discuss her test results, and plaintiff mentioned that she read a Meniere's syndrome pamphlet and it described some of her symptoms quite well (Tr. 283). Dr. Fortune opined plaintiff "very well may have Meniere's syndrome although the diagnosis is not entirely clear at this time." Id. His diagnosis on that date was peripheral vertigo, asymmetric sensorineural hearing loss, and acute maxillary sinusitis. Id. Dr. Fortune recommended plaintiff not drive when her symptoms were active. Id. He prescribed an antibiotic for plaintiff's sinusitis, and Dyazide (a diuretic) and a low-salt diet (2 grams per day) for her peripheral vertigo and tinnitus. Id.

By the time of her next visit to Dr. Fortune on May 23, 2001, plaintiff complained of episodic vertigo and dizziness, as well as right ear pain and pressure (Tr. 282). She reported a sensation of motion when she closed her eyes, tinnitus, fluctuating hearing, and an aural fullness associated with nausea. Id. Dr. Fortune diagnosed plaintiff as suffering from peripheral vertigo with tinnitus and acute recurrent maxillary sinusitis, although he noted that "[t]he constellation of symptoms is certainly consistent with Meniere's and this is

8

foremost in our differential diagnosis." Id. Dr. Fortune prescribed continuation of the low-salt diet and diuretic medication, and added Robinul for her vestibular symptoms and Phenergan as needed for associated nausea.

On July 3, 2001, plaintiff complained her persistent dizziness was getting worse (Tr. 281). She reported severe motion-induced symptoms with severe nausea and difficulty ambulating. Id. Her symptoms had become so severe that she had become unable to drive a car. Id. Dr. Fortune noted plaintiff's symptoms had been "fairly refractory to maximum medical therapy." Id. He reported plaintiff's gait as "unsteady requiring her to frequently hold on to the wall while ambulating." Id. He prescribed Droperidol drops as a rescue medication for severe nausea and vertigo, in addition to the Phenergan. Id. Dr. Fortune planned to schedule an appointment with a neuro-otologist[1] "to attain a second opinion regarding further medical management or possibly surgical intervention." Id.

On August 12, 2001, neuro-otologist C. Gary Jackson, M.D., F.A.C.S., reported back to Dr. Fortune after examining plaintiff, noting the following:

> Neurotologic evaluation was unremarkable. There was a high-frequency sensorineural hearing loss with 92% discrimination score on audiology.

---

[1]A neuro-otologist is a physician specializing in the medical treatment and surgery of the ear, particularly as it relates to those portions of the nervous system related to the ear. Dorland's Illustrated Medical Dictionary 1132, 1205 (28th ed. 1994).

9

I think this lady may, in point of fact, have very
atypical Meniere's disease.  I have asked her to
reinforce her low-salt diet and get on her diuretic.
We will complete her evaluation.

There is more than meets the eye in Ms. Anderson which
I have yet to figure out.  She apparently lost her
hearing as a teenager and in response to what she
describes as debilitating and a quality of life-
threatening imbalance her affect appears remarkably
inappropriate.  She also showed up in our office
wearing high heels.  We'll see what turns up.

(Tr. 523-24)  There is no record of any further evaluation by Dr.

Jackson.

Plaintiff complained of ringing in both ears and

persistent attacks of vertigo, with intermittent dizziness

between the attacks, on a September 19, 2001, visit to Dr.

Fortune (Tr. 279).  Audiological testing on that date revealed no

significant change when compared to March 29, 2001.  Id.  After

noting that "[t]he overall clinical picture is becoming more

consistent with endolymphatic hydrops [(i.e., Meniere's

disease)]," Dr. Fortune scheduled further tests to confirm that

diagnosis.  Id.  Although a test on September 20, 2001, was

negative for Meniere's (Tr. 276), Dr. Fortune nonetheless

diagnosed active cochleovestibular Meniere's disease on November

8, 2001 (Tr. 275).  He further noted that plaintiff would be kept

on her current treatment with medication, though he did discuss

the alternative option of two procedures, an endolymphatic sac

decompression and Dexamethasone perfusion, which plaintiff said

Case 3:07-cv-00343  Document 22  Filed 09/10/08  Page 10 of 45 PageID #: 114

she would consider.  Id.  There is no further reference in Dr. Fortune's treatment records to these optional procedures.

On February 12, 2002, plaintiff reported her "vertigo [was] under control now," and Dr. Fortune characterized her Meniere's as "inactive" (Tr. 272-73).  However, on a visit on May 21, 2002, plaintiff reported her symptoms had "flared up" and that she was unable to drive due to her symptoms; she also reported her vertigo and tinnitus were worse (Tr. 270), and Dr. Fortune characterized plaintiff's Meniere's as active (Tr. 271). Dr. Fortune completed a Meniere's disease questionnaire on that same day, in which he assessed disabling limitations from plaintiff's active cochleovestibular Meniere's disease (resulting in an average of 3 symptomatic attacks per week, each of 30 minutes duration with a few hours of post-attack residuals), allergic rhinitis, and chronic sinusitis.  (Tr. 265-69)

On April 29, 2003, plaintiff complained her balance had been off (worse with motion) and that she had not been driving due to her symptoms (Tr. 554).  Dr. Fortune opined plaintiff was experiencing "active vestibular Meniere's disease" (Tr. 555).  On April 21, 2004, plaintiff reported continued symptoms of Meniere's, as well as fibromyalgia, and once again Dr. Fortune diagnosed her as suffering from active vestibular Meniere's disease (Tr. 725).  It appears that plaintiff has continued to receive symptomatic treatment with medication for her Meniere's

11

disease, though she rarely saw Dr. Fortune after 2002 because she did not want to trouble others to drive her there, she could not afford frequent visits in any event, and Dr. Fortune had basically told her there was nothing further to be done but treat the symptoms when they arise.  (Tr. 761-62)

E.  <u>Consultative Examinations</u>

Bruce Davis, M.D., performed a consultative physical examination of plaintiff on November 29, 2000 (Tr. 232-34).  He noted plaintiff was slow changing positions on/off the examination table and needed assistance; exhibited tenderness in the upper extremity, chest, and back; had mild weakness in her grip bilaterally; and reported back pain with motion (Tr. 233).  Based on his examination, Dr. Davis opined plaintiff could occasionally lift/carry less than 50 pounds, frequently lift/carry less than 25 pounds, stand/walk less than 6 hours per 8-hour workday, and sit 8 hours per 8-hour workday (Tr. 234).

Dr. Davis performed another consultative examination of plaintiff on March 31, 2003 (Tr. 551-53).  He noted generalized tenderness to light palpation about plaintiff's extremities, chest, and spine, and he reported plaintiff constantly complained of pain throughout exam maneuvers (Tr. 552).  Plaintiff's back pain limited her range-of-motion.  <u>Id.</u> Dr. Davis reported full, but slow, motion in plaintiff's neck, shoulders, elbows, and wrists and noted reduced pinch/grip strength (3/5) in her

12

fingers. <u>Id.</u> As he did on his first examination (Tr. 234), Dr. Davis diagnosed plaintiff as suffering from fibromyalgia (Tr. 553). He opined plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk up to 6 hours per 8-hour workday but less than 1 hour uninterrupted, and sit 8 hours per 8-hour workday (Tr. 553). He further opined plaintiff was limited (extent not specified) in bending and squatting, could tolerate only limited (again, extent not specified) exposure to heat and humidity, should avoid climbing and working at heights, and should avoid activities requiring a forceful grip. <u>Id.</u>

Alan Yarbrough, Ed.D., performed a consultative psychological examination of plaintiff on December 1, 2000 (Tr. 236-38). Plaintiff reported experiencing a depressed mood episodically, usually associated with the presence of pain (Tr. 237). Dr. Yarbrough did not diagnose plaintiff as suffering from any mental impairment and assessed her global functioning (GAF) at 60 (Tr. 238).

Dr. Yarbrough performed another consultative examination of plaintiff on April 17, 2003 (Tr. 599-601). He reported plaintiff continued to experience a depressed mood, loss of interest in her former hobbies, a low energy level, difficulty concentrating, and occasional suicidal ideation (Tr. 600). She also experienced anxiety and described episodes of increased

13

anxiety where she had difficulty breathing, became dizzy, and suffered heart palpitations. Id. She told Dr. Yarbrough she required a traveling companion when leaving her home due to symptoms of Meniere's disease and fibromyalgia and that she no longer drove an automobile due to these symptoms. Id. Dr. Yarbrough reported no deficits in plaintiff's long-term memory and characterized her short-term memory as "fairly intact." Id. He reported her mood was depressed and noted she was tearful at times (Tr. 601). Dr. Yarbrough characterized plaintiff's general behavior as "cooperative and appropriate." Id. He diagnosed plaintiff as suffering from a major depressive episode, single episode (mild by history) and an anxiety disorder, not otherwise specified, with limited symptom panic attacks and assigned plaintiff a GAF of 52. Id. In terms of functional limitations, Dr. Yarbrough reported plaintiff experienced mild concentration difficulty and mild impairment in her ability to adapt. Id.

### F. State-Agency Consultants

A state-agency psychological consultant found plaintiff suffered from no severe mental impairment prior to plaintiff's first hearing (Tr. 239). Following remand, another consultant reported plaintiff suffered from affective and anxiety-related disorders (Tr. 610, 613, 615) and experienced mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and

14

had never experienced extended episodes of decompensation (Tr. 620, 624-25).

A state-agency medical consultant at the initial level of adjudication found plaintiff suffered from no severe physical impairment (Tr. 256), while a different consultant at the reconsideration level concluded plaintiff could perform light work (Tr. 258). Following remand, other consultants reached the same conclusion (Tr. 603, 677). None of the state-agency consultants examined, treated, or spoke with plaintiff.

G. Medical Expert Testimony

Following the court remand, the Appeals Council ordered the ALJ to obtain "evidence from a medical expert on the nature and severity of the claimant's impairments." (Tr. 440). To that end, Fred Goldner, M.D., testified (Tr. 765-783). Dr. Goldner, an internal medicine specialist, reviewed the evidentiary record and heard plaintiff testify (Tr. 766). Dr. Goldner testified that both Meniere's disease and fibromyalgia were adversely affected by stress and that made it "difficult in terms of controlling Meniere's and definitely the fibromyalgia." (Tr. 773). He also stated that plaintiff's blood tests were negative and the fact that she had an elevated sedimentation rate did not mean she had any significant fibromyalgia. Id.

On cross-examination, Dr. Goldner admitted that symptoms of plaintiff's Meniere's disease were variable (Tr.

15

Case 3:07-cv-00343  Document 22  Filed 09/10/08  Page 15 of 45 PageID #: 119

775).  He also stated: "Fibromyalgia is such a difficult — it's difficult to say that she has fibromyalgia." *Id.* When asked whether he disagreed with all the doctors who diagnosed plaintiff as suffering from fibromyalgia, including a rheumatologist and professor of medicine at Vanderbilt Medical School, Dr. Thomas, Dr. Goldner stated: "I didn't see her to examine her, so I would say that I have to use [the doctor's] viewpoint as being important to them, but at the same time, I think that I would find some other people who would review this record and disagree." <u>Id.</u> Dr. Goldner candidly admitted that a doctor who has followed a patient for a period of years would be in a better position to diagnose that patient's condition than someone who had never examined the patient at all. <u>Id.</u> He also admitted that a specialist in the field of rheumatology would be in a better position to diagnose a patient as suffering from fibromyalgia than a physician who had never examined the patient (Tr. 775-76). When asked whether an ear, nose, and throat specialist would be in a better position to diagnose a patient as suffering from Meniere's disease than a nonspecialist who had never examined the patient, Dr. Goldner responded, "Of course." (Tr. 776).  When asked about the fibromyalgia residual functional capacity questionnaire (Tr. 294-98) completed by Dr. Fleming, who had treated plaintiff for at least three and one-half years (Tr. 294), Dr. Goldner stated, "he [Dr. Fleming] feels that's that

16

[sic] what it is.  As you pointed out, there's nothing objective." (Tr. 777).  Counsel then asked Dr. Goldner if there were criteria for the diagnosis of fibromyalgia issued by the American College of Rheumatology, to which he responded in the affirmative (Tr. 778).  When counsel pointed out that Dr. Fleming had responded in the affirmative to the question of whether plaintiff met the American College of Rheumatology criteria for fibromyalgia, Dr. Goldner admitted he couldn't disagree with Dr. Fleming's finding.  Id.

Dr. Goldner agreed that an ear, nose, and throat specialist would be the type of physician that would typically diagnose and treat a patient suffering from Meniere's disease (Tr. 779).  Dr. Goldner testified he agreed with Dr. Fortune's diagnosis of Meniere's disease but that the way plaintiff described her condition was "not classically the way Meniere's presents itself." (Tr. 781). Dr. Goldner reviewed the Meniere's disease residual functional questionnaire completed by Dr. Fortune on May 21, 2002 (Tr. 265-69).  When asked whether he would dispute the limitations identified by Dr. Fortune, Dr. Goldner stated, "No, I would accept those if the patient states it." (Tr. 781).  He admitted that when a patient makes a complaint to their doctor, they typically want the doctor to do something to alleviate those complaints.  Id.  However, Dr. Goldner felt plaintiff had not received the full range of

17

treatment he would like to see in a patient with Meniere's (Tr. 782). Finally, Dr. Goldner admitted that plaintiff's testimony concerning her symptoms was consistent with the variability of her symptoms and functional limitations. Id.

H.   Plaintiff's Testimony

As summarized by the ALJ, plaintiff gave the following testimony at her most recent hearing:

> The claimant testified that her symptoms were worse now than at her first hearing. She stated she had more pain and fatigue from the fibromyalgia, and the ringing and dizziness in her ears with loss of balance due to Meniere's. Any motion caused her to be sick at her stomach and even laying in bed the room would start spinning around. The claimant stated that the doctors had told her there was nothing they could do for her other than prescribing medication. The claimant estimated that on a good day she could sit for an hour, walk for an hour, stand for fifteen to twenty minutes, and lift a gallon of milk but she could not carry it around. On a bad day she just stayed in her recliner. The claimant reported she had ringing in both ears, but was hard of hearing only in her left ear. The claimant stated that she went shopping with a relative to WalMart, and her husband accompanied her grocery shopping. She stated that she never went anywhere alone due to vertigo, and no longer drove an automobile. On a good day she had less pain and dizziness and could do some light housework, but on a bad day she had more pain and dizziness and just stayed in her recliner and took her medication. She stated that she took a lot of medication that sometimes made her drowsy and spacey especially if she had not eaten anything. The claimant reported she was having an increasing problem dealing with stress and that both of her problems were affected by stress. Even getting a letter from Social Security or a bill would make her sick at her stomach. The claimant reported numerous other problems including sinus infections, rapid heart rate, irritable bowel syndrome, reflux, high blood pressure, high cholesterol, and depression for which she took medication. (Tr. 384-85)

18

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007)(<u>quoting Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

#### B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation

20

process can be carried by relying on the medical-vocational
guidelines, otherwise known as "the grids," but only if the
claimant is not significantly limited by a nonexertional
impairment, and then only when the claimant's characteristics
identically match the characteristics of the applicable grid
rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir.
2003).  Otherwise, the grids cannot be used to direct a
conclusion, but only as a guide to the disability determination.
Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir.
1990).  In such cases where the grids do not direct a conclusion
as to the claimant's disability, the SSA must rebut the
claimant's *prima facie* case by coming forward with proof of the
claimant's individual vocational qualifications to perform
specific jobs, which is typically obtained through vocational
expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting
Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see
also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779
(6th Cir. 1987).

In determining residual functional capacity ("RFC") for
purposes of the analysis required at steps four and five above,
the SSA is required to consider the combined effect of all the
claimant's impairments, mental and physical, exertional and
nonexertional, severe and nonsevere.  See 42 U.S.C. §§
423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th

21

Cir. 1988).

C.    Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in rejecting the opinions of her treating internist, Dr. Fleming, and her treating ENT physician, Dr. Fortune, without giving good reasons in support of that rejection.  Secondly, plaintiff argues that the ALJ's decision to discount the credibility of her subjective complaints is neither substantially supported by the evidence nor consistent with the governing regulations and caselaw.  Finally, plaintiff argues that the ALJ's finding of her ability to return to her past relevant work, without considering the contrary evaluation of plaintiff's immediate supervisor in her last job, is not substantially supported by either the vocational or the medical evidence.  As further detailed below, the undersigned agrees that the administrative decision contains errors which warrant its reversal, and further finds the record sufficient to establish plaintiff's entitlement to benefits.

The ALJ opinion suffers a number of infirmities which, in the undersigned's view, may not be reconciled with the proof on this record.  First and foremost, it does not appear that the proper deference was given the opinions of plaintiff's treating physicians.  Key among the evidentiary standards that bind Social Security ALJ's is that greater deference is generally owed the opinions of treating physicians than those of nontreating

22

physicians. <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 242 (6th Cir. 2007). When such opinions are sufficiently supported and not substantially opposed, they are entitled to controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even when such opinions are not controlling, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference ..." <u>Rogers</u>, 486 F.3d at 242. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." <u>Barker v. Shalala</u>, 40 F.3d 789, 794 (6th Cir. 1994). In the instant case, although the ALJ's finding at step two of the sequential evaluation process identified fibromyalgia and Meniere's disease as severe, medically determinable impairments, and though both diagnoses have long since been established by treating physicians, the ALJ's conclusions at step four of the process were based largely on the opinions of nonexamining government consultants who did not concur with either these diagnoses, plaintiff's resulting prognosis, or both.

At the direction of the Appeals Council, the ALJ called

23

upon a medical expert, Dr. Fred Goldner,[2] to testify at
plaintiff's most recent hearing (Tr. 765-83). The ALJ based her
finding of plaintiff's RFC upon the testimony of Dr. Goldner, her
own review of the medical evidence, and the assessment of the
nonexamining state agency consultant, which assessment she
adopted with the addition of certain nonexertional restrictions
"in deference to the Meniere's disease." (Tr. 386) This
nonexamining state agency consultant explained his assessment of
essentially light work capability by reference to plaintiff's
record of treatment for myalgia-related pain, but only after
noting his opinion that *fibro*myalgia was improperly diagnosed,
and that her Meniere's disease was mild if it was present at all.
(Tr. 603-04) The consultant further noted that his assessment of
plaintiff's functional abilities was not inconsistent with the
assessments of her treating sources (Tr. 608).

        Of course, the problem is that the opinions of Dr.
Goldner and the nonexamining consultant *are* inconsistent with the
opinions of Drs. Fleming and Fortune, at least insofar as the
latter describe plaintiff's inability to sustain the performance
of light (or any other exertional level) work activity on a
regular and continuing basis, *i.e.*, 8 hours per day, 5 days per
week. The ALJ's analysis of the opinions of Drs. Fleming and

_____

    [2]Dr. Goldner testified that he had practiced internal medicine for
nearly 49 years, but had retired his practice and was a professor at
Vanderbilt University at the time of the hearing (Tr. 766). He also had been
testifying at disability hearings for the prior four to five years. (Id.)

Fortune suffers on account of her (and Dr. Goldner's) apparent misperception of the nature of fibromyalgia, and her misperception of the record evidence supporting the severity and guarded prognosis of plaintiff's Meniere's disease.

Of note, there does appear to be a concurrence among Dr. Goldner and Drs. Fleming and Fortune with regard to the effect of stress on plaintiff's symptoms. Dr. Goldner testified (addressing plaintiff) that he "was impressed with the way you have had an increasing difficulty when you face stress[; ...] that can be so difficult in terms of controlling Meniere's and definitely the fibromyalgia." (Tr. 773) Specifically in reference to plaintiff's Meniere's disease, Dr. Goldner later reiterated that "stress has been very difficult for her and stress can precipitate. If there's a weakness -- a disease weakness in this are[a] of the body, stress can make it emerge." (Tr. 781) The ALJ neither discussed nor assigned any work restriction against job stress, despite being presented with (1) the foregoing expert testimony; (2) the concurrence of Drs. Fleming and Fortune that stress was a precipitating factor for flare-ups of plaintiff's fibromyalgia and Meniere's disease symptoms, respectively (Tr. 267, 295, 299); (3) the concurrence of these treating physicians that plaintiff was thus incapable of even low stress work (Tr. 269, 296); and, (4) evidence that job stress was not appropriately dealt with on the last job held by

25

plaintiff (Tr. 109-10, 116). The VE testified that a restriction against even low stress work would preclude employment (Tr. 795). Thus, it would appear that plaintiff's disability is established on this record, unless the ALJ properly discounted the severity of plaintiff's fibromyalgia and Meniere's disease symptoms.

## 1. <u>Fibromyalgia</u>

To begin with, the suggestion by the state agency consultant and Dr. Goldner that plaintiff was improperly diagnosed with fibromyalgia simply cannot withstand the weight of the contrary evidence from Dr. Fleming and the specialist he consulted, Dr. James W. Thomas (Tr. 221, 230).[3] Dr. Fleming has been plaintiff's internist since 1994 (Tr. 525). He consulted Dr. Thomas in October 1998 for the latter's diagnostic impression of plaintiff's symptom complex, after fibromyalgia was raised as a possibility by other specialists consulted by Dr. Fleming (Tr. 211-13). Dr. Thomas is a rheumatologist, and as such is the appropriate specialist to confirm a diagnosis of fibromyalgia, a "syndrome of soft tissue rheumatism" (Tr. 221). <u>See</u> <u>Rogers</u>, 486 F.3d at 245. "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." <u>Id.</u> at 244. Dr. Thomas's

---

[3] While the ALJ accepted the diagnosis, she nonetheless relied on the nonexamining physicians' skepticism in determining the severity of the alleged fibromyalgia symptoms.

26

appreciation of multiple tender points and palpable muscle spasms in her back and neck, along with other telling characteristics, establishes beyond reasonable question the first element of the diagnostic process, which is also supported by other record evidence of nonspecific pain over the whole body and multiple trigger points (Tr. 143-44, 212-13). As to the ruling out of other conditions, such other causes of pain, reduced motor function, and fatigue were eliminated upon normal film study of plaintiff's right hip (Tr. 166), normal nerve conduction study and needle electromyography (Tr. 175-76, 215-18), normal blood and urine analysis (Tr. 178-82), and upon gynecological and neurological consultation to rule out causes related to hormonal levels, thyroid disease, or generalized myalgias. (Tr. 205-06, 209-14) By letter dated May 28, 2002, Dr. Fleming opined that plaintiff was no longer able to work due to her combination of symptoms from fibromyalgia, Meniere's disease, and other conditions, noting that she had been diagnosed with fibromyalgia "[a]fter numerous lab tests, x-rays and specialist visits"; he stated that her pain is sometimes decreased by medications, but is worse during weather changes and times of increased stress. (Tr. 299)

In spite of this evidence, as well as her own finding that fibromyalgia was one of plaintiff's severe impairments, the ALJ recounted the following testimony of Dr. Goldner, ultimately

27

citing it in support of her adoption of the state agency

consultant's assessment:

> The medical expert listened to the testimony, reviewed
> all the medical evidence and then gave his opinion that
> it was doubtful the claimant had fibromyalgia noting
> that her rheumatologist did not note any significant
> findings other than sign of some trigger point
> tenderness but no objective evidence such as abnormal
> x-ray findings or positive lab studies such as RA
> (rheumatoid arthritis) or ANA (antinuclear antibody).
> He noted that she did have an elevated sed rate, but
> that could be due to any type of infection including
> sinus infection.  The claimant's attorney questioned
> Dr. Goldner and asked him if he disagreed with the
> diagnosis of fibromyalgia by her treating
> rheumatologist.  Dr. Goldner replied that if that was
> what he wanted to diagnos[e] the claimant with based on
> her subjective complaints, he would not question the
> diagnosis but he pointed out the lack of objective
> evidence and stated that other doctors reviewing the
> file independently would question the diagnosis. ...

(Tr. 386)

As plaintiff points out, this analysis reflects a

fundamental misunderstanding of the nature of fibromyalgia, the

diagnosis of which is simply not indicated, confirmed, or ruled

out by film or laboratory studies of any kind.  Defendant agrees

that the "diagnosis of fibromyalgia is supported by the clinical

findings," but nonetheless relies in part on the absence of

unspecified results from "specific lab tests" that are "some of

the criteria used to diagnose fibromyalgia" (Docket Entry No. 20

at 7); this reliance is unfounded.[4]  As the Sixth Circuit has

noted on more than one occasion, "fibromyalgia patients present

---

[4]E.g., http://www.mayoclinic.com/health/fibromyalgia-symptoms/AR00054.

28

no objectively alarming signs.  Rather, fibromyalgia patients

'manifest normal muscle strength and neurological reactions and

have a full range of motion.' ... 'CT scans, X-rays, and minor

abnormalities ... are not highly relevant in diagnosing

[fibromyalgia] or its severity.'" Rogers, 486 F.3d at 243-44

(internal citations omitted)(quoting Preston v. Sec'y of Health &

Human Servs., 854 F.2d 815, 820 (6th Cir. 1988)).  Moreover, Dr.

Thomas himself stated that normal laboratory studies were

consistent with the diagnosis (Tr. 221).  Despite this authority

and evidence, the ALJ here followed nearly the identical path

taken by the ALJ whose decision was reversed in Rogers, crediting

the RFC assessment of a nonexamining state agency physician and

the consistent opinion of a testifying expert, neither of whom

appeared to be rheumatologists, and both of whom credited some

extent of pain but refused to credit the full extent of alleged

pain solely because of a lack of corroborative, objective medical

findings, save for a single report of an elevated sedimentation

rate.  Cf. Rogers, 786 F.3d at 239-45.  Just as in Rogers, the

ALJ here erred in relying on opinion evidence from nontreating

sources -- "a fact of special significance given the unique

nature of fibromyalgia," id. at 245 -- that was founded upon a

lack of objective findings, a fact which Dr. Fleming, Dr. Thomas,

and the Sixth Circuit agree is not particularly probative of the

29

presence or severity of fibromyalgia.[5]

Defendant argues that the unpublished case of <u>Stiltner v. Comm'r of Soc. Sec.</u>, 2007 WL 2264414 (6th Cir. Aug. 7, 2007), presents facts that closely match the facts in the case at bar, and "completely rebuts" the proposition that a treating physician's assessment of fibromyalgia cannot be rejected due to lack of objective findings. (Docket Entry No. 20 at 7) The undersigned cannot agree. While <u>Stiltner</u> involved a claimant with fibromyalgia, it is otherwise readily distinguishable from the instant case, in terms of the treating physician's infrequent contact with plaintiff during the relevant time period; his repeated, conclusory statements after each of these few visits that plaintiff was "totally disabled," could not return to her prior employment, and was not a candidate for any gainful employment, which are of course legal conclusions for the ALJ to make; and particularly in terms of the evidence cited by the ALJ and the reasoning behind his weighing of that evidence. Regarding this latter, critical element of the comparison, the instant case is far more similar to <u>Rogers</u> than to <u>Stiltner</u>, as

---

[5]<u>Cf.</u> <u>also</u> <u>Haldeman v. Massanari</u>, 2002 WL 32348341, at *4 (E.D. Pa. Jan. 10, 2002)("[A] claimant with fibromyalgia cannot be held to an impossible standard; she cannot be faulted or the absence of medical evidence that does not characterize her condition. ... While an ALJ is entitled to deference in his credibility determinations, he may not rest his credibility determinations on a misunderstanding of a medical condition ... I find that the ALJ committed error by second-guessing a treating specialist as to the proper diagnosis of a medical condition that the SSA considers medically determinable, without even consulting a medical adviser in that specialty for a second opinion.").

30

noted above.

Moreover, inasmuch as one panel of the court may not overturn the published decision of a prior panel, 6 Cir. R. 206(c), the Stiltner panel was clearly bound by the reported opinion in Rogers and its ruling that a treating physician's assessment of fibromyalgia-related limitations cannot be rejected solely by reference to assessments of lesser limitations by nontreating physicians who focus on the lack of objective findings, without some further explanation of good reasons for giving less weight to the treating physician. Nor would the Stiltner panel disagree, as it in fact cited Rogers for this proposition. 2007 WL 2264414, at *5. To the extent that Stiltner offers support for the proposition that the subjective symptoms of fibromyalgia may properly be discounted because they are not objectively confirmed on range of motion, muscle strength, or neurological testing, see Stiltner, 2007 WL 2264414, at *5 (agreeing with ALJ that substantial evidence supported a finding that Stiltner retained adequate neurologic and motor functions, including adequate range of motion), it impermissibly conflicts with both Rogers and Preston, supra, and the findings of those panels that such normal test results or only minor abnormalities are not relevant to the assessment of limitations from fibromyalgia's symptoms of "'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" Rogers, 486

31

F.3d at 243 n.3 (<u>quoting</u> <u>Stedman's Medical Dictionary for the</u>
<u>Health Professions and Nursing</u> at 541 (5th ed. 2005)). For these
reasons, the undersigned does not consider <u>Stiltner</u> to be
particularly instructive in this case, where the ALJ gave undue
weight to the opinions of nonexamining experts which were based
on a lack of objective medical evidence supporting the alleged
severity of fibromyalgia symptoms.

### 2. Meniere's Disease

The record contains evidence of plaintiff's treatment
for Meniere's and sinus disease with Dr. Fortune for three years
following her first consultation in March 2001 (Tr. 290).[6] Dr.
Fortune is an otolaryngologist -- an ear, nose and throat
specialist. His May 2002 assessment of severe limitations from
plaintiff's Meniere's disease, allergic rhinitis, and chronic
sinusitis is very nearly unopposed on this record -- only the
nonexamining physician consulted during proceedings before the
state agency opined that the Meniere's disease was less
functionally limiting. Dr. Goldner questioned the range of
treatment that had been offered by Dr. Fortune (Tr. 781-82), but
testified that there was no reason to question Dr. Fortune's
description of plaintiff's symptoms and limitations (Tr. 781).
Likewise, after his lone examination of plaintiff in August 2001,

---

[6]The record of this first visit to Dr. Fortune reflects plaintiff's
report of a five-month history of symptoms associated with Meniere's disease,
though no mention is made of the severity of these symptoms during the five
months prior to this office visit. (Tr. 290)

32

Dr. Jackson recommended continued treatment of plaintiff's "very atypical Meniere's disease" with conservative measures, and noted her affect and choice of high heeled shoes to be inconsistent with her alleged difficulty with imbalance, but did not otherwise offer an opinion as to enduring limitations (Tr. 523-24). It appears that the symptoms of active Meniere's disease come in sporadic attacks,[7] which in plaintiff's case were largely unpredictable. Plaintiff reported episodic vertigo, dizziness, tinnitus, and other symptoms prior to her first visit with Dr. Fortune, and at all appointments through November 8, 2001, when Dr. Fortune changed his diagnosis from peripheral vertigo, hearing loss and tinnitus to "active cochleovestibular Meniere's disease." (Tr. 275) Plaintiff's disease was thereafter characterized as "inactive," with vertigo under control on February 12, 2002 (Tr. 272-73). The disease was characterized as "active" on visits of May 21, 2002, April 29, 2003, and April 21, 2004 (Tr. 271, 555, 725).

While Dr. Goldner's initial opinion was that plaintiff's medical records supported light work capability (Tr. 386, 767-68), he appeared to have some reservation about that opinion when he requested permission to question plaintiff directly about her vertigo and other Meniere's symptoms (Tr. 768-70). In light of his testimony on cross-examination, as well as

---

[7]See http://www.nidcd.nih.gov/health/balance/meniere.asp.

the further conclusions of the ALJ in assessing plaintiff's
credibility and assigning additional Meniere's-related work
restrictions (Tr. 386-87), it is plain that both Dr. Goldner and
the ALJ based their concurrence with the state agency
consultant's assessment of light work capability on the
assumption that plaintiff's vertigo -- the most obstructive of
her Meniere's symptoms -- could be brought under at least a
reasonable measure of control, if not eliminated outright.

The use of medication to control this vertigo has been
largely unsuccessful, but plaintiff testified that Dr. Fortune
had told her that nothing more could be done about her condition,
and that for this and other reasons she had stopped visiting Dr.
Fortune regularly (Tr. 761-62).  Contrary to this testimony, and
in line with Dr. Goldner's suggestion of further available
treatment, the ALJ specifically found that "[r]egarding [vertigo]
there are a number of surgical procedures that could correct the
problem that she had not pursued although Dr. Fortune discussed
the option with her (Exhibit 27F)."  (Tr. 387)  The ALJ's
reference here is to a treatment note of November 8, 2001,
wherein Dr. Fortune states that he "did discuss the option of an
endolymphatic sac decompression and Dexamethasone perfusion with
her.  She is considering this."  (Tr. 573)  However, the fact
that this is the lone reference to any surgical alternative in
Dr. Fortune's treatment records would seem to support the

34

conclusion that Dr. Fortune did not strongly advocate surgical intervention in plaintiff's case.[8]  Perhaps echoing the intimation of Dr. Goldner's hearing testimony, the ALJ's reference to any number of unnamed surgical remedies for plaintiff's vertigo appears to reflect her dim view of not only plaintiff's level of concern with this symptom, but also Dr. Fortune's dedication to curing the patient for whom he assessed disabling work restrictions.[9]  However, Dr. Fortune's presentation of surgery as an option and not a recommendation

---

[8]Indeed, after plaintiff presented with persistent dizziness that was getting worse, "episodic true whirling spinning which is not responding to Robinul, Dyazide, low salt diet," and severe motion-induced symptoms accompanied by severe nausea, all of which "have been fairly refractory to maximum medical therapy," Dr. Fortune "schedule[d] an appointment with a neuro-otologist to attain a second opinion regarding further medical management or possibly surgical intervention." (Tr. 579)  However, after opining that plaintiff's Meniere's disease was "very atypical," the neuro-otologist, Dr. C. Gary Jackson, concurred with the treatment of plaintiff's symptoms through a low salt diet and use of a diuretic. (Tr. 523)  Thus, there appears to be good reason for Dr. Fortune's subsequent discussion of surgery as merely an option for plaintiff.

Apart from the ear specialist's failure to recommend such treatment (which may be contraindicated in atypical cases of Meniere's disease), and aside from the more significant risks which may be associated with inner ear surgery, it appears that in cases of vertigo associated with Meniere's disease, endolymphatic sac decompression is regarded as controversial in that it is only successful in approximately 70 percent of patients, with a significant number of that 70 percent reporting recurrence of vertigo of the same severity within three years of surgery. http://www.emedicine.com/neuro/TOPIC693.HTM; www.earsurgery.org/meniere.html. It furthermore appears that Dexamethasone perfusion, an outpatient treatment wherein the steroid Dexamethasone is injected into the inner ear through the tympanic membrane (eardrum), was regarded as controversial as late as 2006, and likely more so in 2001. http://www.american-hearing.org/disorders/menieres/menieres.html#treated.

[9]In response to counsel's questioning as to whether in Dr. Goldner's medical practice he relied on what his patients told him, Dr. Goldner testified as follows:  "That's right, but at the same time I want to get them well and not necessarily sticking with one situation of what a specialist says who is doing this when she has -- and many patients have several things acting at the same time and in treating that, if finances were the problem or whatever is the problem, that there are other ways to get at it." (Tr. 782)

(much less a prescription) was a medical judgment that was his to make, a judgment that he in fact made on the heels of an even more specialized surgeon's failure to recommend such a procedure, supra n.4, which the ALJ failed to duly consider. Suffice it to say that the ALJ did not (nor could she) justifiably reconcile her concurrence with a nonexamining expert witness's opinion that alternative, surgical treatment should have been pursued, over the concurring treatment plans of two examining physicians who are specialists in the field.[10]

Part and parcel of the rule of deference to treating physicians is the additional procedural requirement that "the ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Rogers, 486 F.3d at 242 (quoting Soc. Sec. Rul. 96-2p,

---

[10]The undersigned would further note that this is not the only instance in which the ALJ second-guessed the medical treatment plaintiff was receiving: she likewise questioned plaintiff's prescribed diet, asking whether Dr. Fortune had told her "you're supposed to be eating like a rabbit and you're not supposed to put any salad dressing, you're supposed to put lemon [on it]" (Tr. 747); she further asked if plaintiff knew "that sometimes for some people Dyazide [(plaintiff's prescribed diuretic)] needs to not be generic to work well with Meniere's? Has anyone told you that?" (Tr. 749). Finally, the ALJ made the following finding regarding medication side effects: "The claimant reported that she took a lot of medication and it made her drowsy. If so it should be adjusted to prevent daytime somnolence." (Tr. 387) While defendant argues that this "is not a medical statement, but an evaluation by the ALJ of the evidence" (Docket Entry No. 20 at 9), the undersigned finds that, with all due respect, the ALJ has indeed played doctor in this case, and in doing so has lightly regarded the opinion of not just a treating physician, but one who specializes in treating patients such as plaintiff.

36

1996 WL 374188, at *5); see also 20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2).  Apart from the implicit finding that her own
evaluation and that of Dr. Goldner trump the assessments of Drs.
Fortune and Fleming, the reasons given for rejecting these
treating physician assessments are that "they are based on the
claimant's subjective complaints rather than the objective
evidence" (Tr. 386), and "the [assessment] forms definitely
appear designed to lead the physician to a finding of
disability." (Tr. 387)

        Taking the latter reason first, the undersigned finds
no merit to the objection that the assessments were given on
impairment-specific, supposedly leading forms that are not
approved by the agency.  In the first place, the undersigned does
not agree that the forms are designed to elicit an opinion of
disability; regarding the Meniere's assessment form (Tr. 265-69),
at worst it presumes that the subject has some variety of inner
ear dysfunction which manifests in episodic "attacks."  In any
event, if these physicians had been witnesses at plaintiff's
hearing, it would certainly have been permissible to direct their
testimony to relevant topics by using leading questions, since a
disability hearing is a nonadversarial proceeding in which the
ALJ actually must assist the claimant in developing the record,
and therefore "the traditional reasons for distrusting testimony
elicited by leading questions are absent."  Shriver v. Chater,

37

1995 WL 454710, at *3 (10th Cir. Aug. 2, 1995).  Accord Cline v.
Sec'y of Health, Educ. & Welfare, 444 F.2d 289, 291 (6th Cir.
1971); see also 42 U.S.C. § 405(b)(1) ("Evidence may be received
at any hearing before the Commissioner of Social Security even
though inadmissible under rules of evidence applicable to court
procedure.").  Moreover, at least with respect to the Meniere's
assessment form, the form begins with questions that track the
medical criteria of that impairment as established by SSA
regulation to trigger a presumption of disability, 20 C.F.R. Pt.
404, Subpt. P, App. 1, § 2.07, without referencing the
significance to the disability adjudication of such criteria, if
established.  To the extent that the ALJ objects to the design of
this portion of the assessment form, that objection is
inconsistent with her prior justification for finding that no
listed impairment was met or equaled because, inter alia, "[n]o
treating or examining source or medical expert has so concluded."
(Tr. 384)

        As to the reasoning that the treating physician
assessments were based on plaintiff's subjective report of
symptoms and not objective medical proof, this proposition simply
holds no water at all with respect to Dr. Fortune's assessment.
For the sake of context, a presumptively disabling case of
"disturbance of labyrinthine-vestibular function (including
Meniere's disease)" under § 2.07 of the Listing of Impairments is

38

established (when properly diagnosed pursuant to § 2.00(B)) by medical evidence of the following:

> ... a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
> A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
> B. Hearing loss established by audiometry.

In this case, though caloric testing was unremarkable (Tr. 284, 287-88), plaintiff's vestibular disturbance is established by abnormal electronystagmography (Tr. 284-85), the preferred test for such dysfunction.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.00(B)(2).  Severe left-sided, high frequency sensorineural hearing loss is established by repeated audiograms (Tr. 280, 291, 562) and supported by speech audiometry which showed a "significant discrepancy" in left- versus right-sided speech discrimination ability, with a 56% score on word recognition testing on the left, as compared with a 100% score on the right (Tr. 290-91).[11]  Moreover, Dr. Fortune would on occasion perform an "otolaryngology specialty examination" of plaintiff, which has revealed an unsteady gait requiring her to frequently hold on to the wall while ambulating, and abnormal results on Romberg

---

[11]The consulting neuro-otologist, Dr. Jackson, reported "a high-frequency sensorineural hearing loss with 92% discrimination score on audiology." (Tr. 523)  Though the audiology results are not included with Dr. Jackson's letter to Dr. Fortune, his report appears to reflect plaintiff's level of hearing impairment in both ears combined.  Plaintiff does not challenge the ALJ's finding related to her functional ability to hear conversational tones.

39

testing.[12] (Tr. 271, 281) In addition to this documentation of objective test results, plaintiff has been noted to complain of "true whirling spinning" (Tr. 281) and has long been diagnosed with episodic peripheral vertigo in addition to general dizziness, a distinction of some importance in assessing cases of vestibular dysfunction under the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.00(B)(2). She has further been noted to complain of severe motion-induced symptoms including severe nausea and loss of balance (Tr. 281, 290, 554), tinnitus with ringing in both ears and roaring noise on the left, aural fullness, and fluctuating hearing loss (Tr. 270, 275, 279, 282, 290), with episodes of hyperacusis resulting in abnormal sensitivity to certain sounds (Tr. 275, 282, 554).

In short, the treating physician rule -- and with it the requirement of good reason-giving -- has been flouted in this case.

Additionally, in assessing plaintiff's RFC, the ALJ does not appear to have considered the extent to which efforts to control certain symptoms are complicated by their "multifactorial" nature between her Meniere's disease, fibromyalgia and "chronic ethmoid and maxillary sinus disease."

---

[12]This test is to elicit Romberg's sign, which is a diagnostic sign consisting of a swaying of the body or falling when the feet are placed close together and the eyes are closed, the result of a loss of joint position sense. Dorland's Illustrated Medical Dictionary 1526 (28th ed. 1994).

40

(Tr. 555, 565)  In particular, Dr. Fortune has noted that
plaintiff's flare-ups of fibromyalgia symtpoms have made it more
difficult to control her symptoms of inner ear disease (Tr. 554,
578), and there appears to be a medical concurrence that stress
will precipitate attacks of both the Meniere's disease and the
fibromyalgia.  (Tr. 267, 295, 299, 773, 781)  Furthermore, Dr.
Fortune treated plaintiff's ethmoid and maxillary sinus disease
as well as her allergic rhinitis, and imposed work restrictions
against exposure to fumes, dust, and gases (Tr. 269).  Likewise,
Dr. Fleming noted plaintiff's symptoms to include shortness of
breath (Tr. 299).  No work restriction against exposure to
environmental irritants was adopted by the ALJ, though there does
not appear to be any reasonable grounds or explanation for this
omission.

       In light of these errors, the administrative decision
in this case should be reversed.

### 3.   Remedy

       While a judicial award of benefits is inappropriate in
most cases out of deference to the expertise of the agency and
the integrity of the administrative function, such an award is
not inappropriate on a record where all essential factual issues
have been resolved, and the claimant's entitlement is adequately
established by overwhelming proof of disability, or strong proof
of disability without significant proof to the contrary.  See

41

<u>Faucher v. Sec'y of Health & Human Servs.</u>, 17 F.3d 171, 176 (6th

Cir. 1994). Considering the record as a whole, including

assessments of disabling limitations and supporting documentation

from longtime treating physicians; proof of the difficulty of

controlling plaintiff's multifactorial symptoms due to her

particular combination of impairments; vocational testimony

establishing the effects of a limitation against even low levels

of job stress and an excessive rate of expected absenteeism; and

a reported activity level which included only occasional trips to

Wal-Mart or the grocery, no driving, daily visits with her sister

and daughter, and the performance of some light housework "on a

good day" (Tr. 387), and finding negligible evidence of ability

to engage in work activity on a regular and continuing basis

during the relevant timeframe, the undersigned concludes that an

award of benefits is the proper outcome in this case, which

presents strong evidence of disability and has already endured

one judicial remand for further factual development.

    While the record was updated following the prior

reversal and remand by this court, there was little medical proof

of substance added with regard to plaintiff's fibromyalgia and

Meniere's disease, since plaintiff apparently only visited Dr.

Fortune during 2003 and 2004 to renew her prescriptions (Tr. 555,

725) and otherwise consulted his office by phone (Tr. 469), and

since Dr. Fleming's updated treatment notes are mostly illegible

42

(Tr. 700-719).  Plaintiff did submit lengthy medication lists

bearing Dr. Fortune's signature and dated in 2003 and 2004,

respectively (Tr. 732, 728).  Notably, these lists included daily

doses of Zoloft for stress, Robinul Forte for vestibular

symptoms, the diuretic Triam/HCTZ, and Soma with either Loratab

or Darvocet for muscular pain and stiffness.  Limited though this

production might be, it (as well as plaintiff's hearing

testimony) would appear to be the best available evidence of

plaintiff's condition between her documented treatment in 2002

and the expiration of her insured period in 2004, especially

given the nature of plaintiff's impairments and the limited value

of the testimony given by Dr. Goldner.  At this point, given the

constrained time period under review, it appears that any effort

to further develop the record of plaintiff's condition prior to

December 31, 2004 would be fruitless.  In any event, as indicated

above, the documentation and testimony obtained in conjunction

with the prior remand did not yield any particular evidence that

plaintiff's combination of impairments was of a severity less

than the disabling severity to which her treating physicians

attested, and to which plaintiff herself testified.

However, the undersigned finds that the record does <u>not</u>

strongly support plaintiff's disability prior to the time that

her symptoms of Meniere's disease combined with her fibromyalgia

symptoms, and the attendant problems with managing each

43

impairment (particularly under stress) were complicated by their combination.  There is evidence, most notably from the consulting rheumatologist, Dr. Thomas, to suggest that despite plaintiff's alleged onset date in 1998 and the establishment of the fibromyalgia diagnosis that same year, her symptoms were regarded as manageable -- assuming her cooperation with keeping a regular exercise and medication schedule -- for some time thereafter. (Tr. 253-54; see also Tr. 232-24, 236-38)  Also, the records of Dr. Fleming's treatment of plaintiff prior to the onset of her Meniere's symptoms do not appear to contain especially dire complaints or findings, though his handwritten impressions are generally illegible (e.g., Tr. 120-42).  His assessment of disabling limitations was not rendered until May 2002, when he noted plaintiff's additional conditions of Meniere's disease, allergic rhinitis, and chronic sinusitis, and opined that the severity of her combined symptoms was such that "she is no longer able to work, she's unable to do basic household chores at times, and is unable to drive herself to doctors appointments."  (Tr. 294-99)

     Accordingly, the undersigned concludes that this case should be remanded for an immediate award of such benefits due as a result of plaintiff's disability from March 29, 2001, the date that she first consulted Dr. Fortune regarding her worsening symptoms of inner ear disease, to December 31, 2004, her date

44

last insured for such benefits.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner of Social Security be **REVERSED** and the cause **REMANDED** for an immediate award of benefits consistent with the onset of disability as of March 29, 2001.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 9th day of September, 2008.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

45